*676 OPINION.
Marquette
: The difficulty in valuing oil leases is well illustrated by the facts in this appeal. On the Courter lease of 99 acres, the taxpayer drove a well in November, 1913, to a depth of almost 1,600-feet and, finding practically no oil, immediately abandoned the well. The lease was surrendered on July 1, 1914. Wells were later drilled on this land by others, and the land proved to be very productive— so much so that the lease was sold in 1916 for $700,000, and one month later for $1,000,000. That property lay to the northeast of the Adam Biehl discovery well.
On the other hand, leases for property surrounding that held by Andrews and Smith were sold after the original discovery of July 30,1912, and prior to the transfer to the taxpayer, at prices ranging from $57.14 an acre to $300 an acre. Of 10 or more such transactions, oil was brought in on only one of the properties, that one being directly to the south of the taxpayer’s land, and, although the 1912 sales price was $100 an acre, the land later proved to be very productive.
Subsequent events demonstrated that about half of the original acreage acquired by Andrews and Smith was productive, and even the Adam Biehl land, where the oil was first discovered, proved to be only on the border of the subterranean oil pool. Even to the south the land was not entirely productive. A dry area, constituting about two-thirds of the acreage within the Edward Smith lease, became apparent after several successive wells had been driven.
A situation of wide variation in the evidence has been presented for our consideration. Even as recently as September, 1918, the tax- *677 payér, in a letter to the Commissioner, stated, “We estimate the fair market value of this property on March 1, 1913, to be $200,000.” In 1912, after the original discovery, Andrews and Smith declined an offer of $600,000 for the property. Under date of February 5, 1923, petroleum engineers employed by the taxpayer, in rendering a most exhaustive report on all of the taxpayer’s properties, gave a total value at acquisition on November 14, 1912, of $721,271.15, and a March 1, 1913, value for the oil reserves of $797,115.31, and claimed a paid-in surplus on November 14, 1912, of $291,838.22. The divergence of opinion by expert witnesses is shown in the following table:
[[Image here]]
It will be observed that the opinions of the taxpayer’s witnesses show a margin of value between $1,000,000 and $2,268,000, and the full divergence of value runs between $2,268,000 and the $200,000 claimed by the taxpayer itself in 1918. Between these two extremes lies the Commissioner’s determination of $600,000.
All of the witnesses seemed to have sufficient qualifications, from their long experience in the oil business and their knowledge of the particular locality, to express opinions as to value, but it is perfectly apparent that their opinions were based primarily upon the record of production of oil in the immediate vicinity over the series of years subsequent to 1912. At the time of the discovery of oil in 1912, it is obvious that any value of a leasehold was purely speculative and incapable of a reduction to any assured amount. That is sufficiently clear from our reference to the Courter lease, and to the many adjoining properties where leaseholds sold, after the discovery, at prices ranging from $300 an acre to less than $60 an acre, and the fact that none of those leases proved productive of oil except the single one which sold on a basis of $100 an acre. The abandomnent by the taxpayer of over 400 acres, within two years after discovery, shows conclusively that a value of $1,500 an acre could not be credited to every acre of land included within the fifteen leases. Yet, the value admitted by the Commissioner of $600,000 means an average value per acre of about $530 for all of the 1,134 acres. In view of the sales, which in no instance exceeded $300 an acre, and the abandonment *678 by the taxpayer of over one-third of its leaseholds, and the fact that much of the retained acreage showed no oil production, we are not convinced that the fair market value of the property exceeded the value determined by the Commissioner.
It should be observed further that the opinions of the several witnesses, and the engineer’s report as well, had in view the value of the oil within the property, or the value of the land by reason of its natural resources, and did not contemplate a valuation for the leasehold interests, with proper apportionment between the lessors and the taxpayer-lessee. Discounting some degree of exaggeration in a retrospective opinion of value, influenced as the same appears to be by the record of production from the entire oil pool, and crediting the value partially to both lessors and lessees, we find considerable corroboration for the Commissioner’s determination of value in the opinions of the taxpayer’s own witnesses.
We were not advised of the method used by the Commissioner in his determination of value. The taxpayer relied entirely upon opinion evidence,: and the report by the engineer to the taxpayer was submitted by the Commissioner in contradiction of the taxpayer’s contention as to value. Except for the facts set forth in that report, we have had no opportunity for making a careful appraisal of the leaseholds in question. This must have been done by the Commissioner in reaching his conclusion, and the data in the report of the taxpayer’s engineer confirms that decision. For example, the engineer arrived at a total value for the property on November 14, 1912, with the following apportionment:
[[Image here]]
*679 Apportioning five-sixths of that amount to the lessee, would give a value of $591,554.30, or approximately the total value allowed by the Commissioner, and we believe a value of $600,000 represents the fair market value of the properties at November 14, 1912, when they were acquired by the taxpayer, and that this amount should be used in computing invested capital.
The Commissioner determined the value as of March 1, 1913, to ■ be $616,404.93, or an increase of $16,404.83 over the values of November 14, 1912. The evidence does not show to what this increase in value was attributed, nor has the taxpayer shown any error therein. In the circumstances, the Commissioner’s determination of March 1, 1913, value must be approved.